# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ADAM THULL**, | Case No. 3:13-mc-00102 |
| Plaintiff, | |
| v. | |
| **TECHTRONIC INDUSTRIES CO., LTD**, *et al.*, | |
| Defendants. | |
| | |
| **EDGAR JESUS SANTILLAN PADILLA** and **KARLA SANTILLAN,** | Case No. 3:13-mc-00128 |
| Plaintiffs, | |
| v. | |
| **SEARS, ROEBUCK & CO.,** *et al.*, | |
| Defendants. | |

## OPINION AND ORDER

J. Matthew Donohue, Markowitz Herbold Glade & Mehlhaf, PC, 1211 S.W. Fifth Avenue, Suite 3000, Portland, OR 97204. Eric D. Pearson, Haygood, Orr & Pearson, 2331 W. Northwest Highway, 2nd Floor, Dallas, TX 75220. Attorneys for Plaintiffs.

Walter H. Sweek, Cosgrave Vergeer Kester, LLP, 500 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204. Meghan M. Sciortino, Johnson & Bell, Ltd., 33 West Monroe Street, Suite 2700, Chicago, IL 60603. Patrick Mark Mahoney, Schiff Hardin LLP, One Market Spear St. Tower, 32nd Floor, San Francisco, CA 94105. Attorneys for Defendants.

Bruce L. Campbell & Michelle B. Smigel, Miller Nash LLP, 111 SW Fifth Avenue, Suite 3400, Portland, OR 97204. Attorneys for SawStop, LLC, SD3, LLC, and Dr. Stephen F. Gass.

**Michael H. Simon, District Judge**.

This consolidated action involves discovery disputes arising out of third-party subpoenas served in the District of Oregon on an individual and his two affiliated companies by the defendants in two separate lawsuits pending in different United States District Courts outside of Oregon. In each of the two underlying actions, the plaintiffs allege product liability claims arising out of personal injuries received by the plaintiffs while using power table saws manufactured or sold by the defendants. Also in these underlying lawsuits, the individual served with the defendants' third-party subpoenas had "volunteered" to present testimony as an unpaid expert witness in support of the plaintiffs' claims. Further, the subpoenaed companies that are affiliated with this individual manufactures and sells power saws, or holds related patents, in competition with the defendants. The subpoenaed individual and his two affiliated companies filed objections, and the defendants moved to compel. This dispute is substantially similar to another discovery dispute recently decided by this Court in connection with a different underlying product liability lawsuit involving different plaintiffs and defendants but concerning a similar third-party subpoena served on the same individual and his two companies after that individual also volunteered to be an unpaid expert witness for the plaintiff in that case. For the reasons that follow and consistent with this Court's earlier opinion on similar questions, Defendants' Motions to Compel (*Thull* Dkt. 1; *Santillan* Dkt. 1) are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff Adam Thull sued Defendants Techtronic Industries Co., LTD; Techtronic Industries North America, Inc.; One World Technologies, Inc.; Ryobi Technologies, Inc.; and Home Depot U.S.A., Inc. (collectively "Techtronic Defendants") for product liability claims in

an action pending in the United States District Court for the District of Minnesota. *See Thull v. Techtronic Industries, Inc.*, Civil Action No. 11-cv-02368-PAM-LIB (D. Minn.). Plaintiffs Edgar Jesus Santillan Padilla and Karla Santillan sued Defendants Black Co. and Sears, Roebuck, & Co. (collectively "Black Defendants") for product liability claims in an action pending in the United States District Court for the Northern District of California. *See Santillan v. Black Co.*, Case No. 5:12-cv-00653-EJD (N.D. Ca.).

In both of these underlying lawsuits, Defendants caused subpoenas to be issued by the United States District Court for the District of Oregon and served on three related non-parties: SawStop, LLC ("SawStop"), SD3, LLC ("SD3"), and Stephen F. Gass, Ph.D. ("Dr. Gass") (collectively "SawStop" or the "Subpoenaed Entities"). Defendants' subpoenas required the production or inspection of responsive documents in Oregon, where the Subpoenaed Entities reside. The Subpoenaed Entities timely objected to Defendants' requests. Thereafter, Defendants commenced two miscellaneous actions pursuant to Federal Rule of Civil Procedure 45(c)(2)(B)(i), seeking orders compelling discovery. *Thull* Dkt. 1; *Santillan* Dkt. 1. Because of the substantial similarity of the issues and at the unopposed request of Defendants, the Court consolidated the two miscellaneous actions. *Thull* Dkt. 10; *Santillan* Dkt. 5.

Dr. Gass invented and patented active injury mitigation technology ("AIMT") for power saws and other similar woodworking equipment.[1] Dr. Gass is president of SawStop and holds both a Ph.D. in physics and a law degree. He has worked as a patent attorney and is a lifelong "woodworker." The SawStop technology "includes a safety system that detects accidental

---

[1] These two actions are substantially similar to a matter the Court previously addressed, *Santella v. Grizzly Industrial, Inc.*, Civ. No. 3:12-mc-00131-SI (D. Or.). The Court's brief recitation of the present disputes' background is taken from the Court's September 26, 2012 Opinion and Order in the *Santella* case, *Santella* Docket Number 40 (henceforth "*Santella* Dkt.").

contact between a person and the spinning blade of a saw, and then reacts to minimize any injury." *Santella* Dkt. 2, at p. 13 ¶¶ 2-3. Dr. Gass filed the first patent application describing the SawStop technology in 1999, and since then the U.S. Patent and Trademark Office has issued numerous patents "disclosing various implementations, features and improvements related to the technology." *Id.* at p. 14 ¶ 8. Dr. Gass commercialized the first table saw incorporating AIMT in 2004. SD3 holds the patents covering AIMT.

Defendants manufactured or sold table saws to Plaintiff Thull and Plaintiff Santillan's employer that do not incorporate AIMT. *Thull* Dkt. 3-1, at p. 4 ¶¶ 11-13; *Santillan* Dkt. 4-1, at p. 6 ¶¶ 12-13. Plaintiffs suffered injuries when using these table saws. *Thull* Dkt. 3-1, at p. 7 ¶ 33; *Santillan* Dkt. 4-1, at p. 10 ¶ 37. Plaintiffs brought suit in their respective jurisdictions, alleging claims of, *inter alia*, strict product liability, breach of implied warranty, and negligence. *Thull* Dkt. 3-1, at pp. 8-16; *Santillan* Dkt. 4-1, at pp. 10-15.

In each lawsuit, Dr. Gass, as a volunteer and without compensation, filed an expert report in which he opines: "It is both economically and technically feasible to redesign the saw at issue to incorporate the SawStop technology." *Thull* Dkt. 3-2, at p. 29 ¶ 67; *Santillan* Dkt. 4-2, at p. 1 ¶ 67. Dr. Gass begins each expert report by noting that he has been asked by Plaintiffs' attorneys to "provide fact and expert testimony" in that particular case and is "willing to do so." *Thull* Dkt. 3-2, at p. 1; *Santillan* Dkt. 4-1, at p. 23. Dr. Gass then adds: "However, I am neither retained nor specially employed to provide expert testimony, and therefore, I understand a written report of my opinion is not required." *Id.* Presumably, this is why Defendants sought discovery relating to the Subpoenaed Entities through a Rule 45 subpoena to non-parties, rather than under Federal Rule of Civil Procedure 26(a)(2)(B), which relates to discovery from expert

witnesses who have been "retained or specially employed to provide expert testimony in the case."

## DISCUSSION

In resolving Defendants' Motions to Compel, the Court must address three issues: (1) the validity of each of Defendants' document requests under Rule 45; (2) whether Defendants' expert, Mr. Peter Domeny, may have access to SawStop's confidential documents; and (3) whether SawStop's costs of compliance should be shifted, in whole or in part, to Defendants.

**I.    Defendants' Rule 45 Subpoenas**

On March 1, 2013, Techtronic Defendants served a subpoena on SawStop requesting the production of responsive documents in 35 categories. *See generally Thull* Dkt. 3-3. On March 28, 2013, Black Defendants served a subpoena on SawStop requesting the production of responsive documents in 16 different categories. *See generally Santillan* Dkt. 4-2, at 27-32. SawStop timely objected to these requests. *See Thull* Dkt. 3-13; *Santillan* Dkt. 4-2, at 36-45. Although many of the requests in the *Thull* and *Santillan* subpoenas are substantially similar, the specific numbered requests do not necessarily match or correspond across both subpoenas. Accordingly, the Court sets forth the following table for convenience:

| *Thull* Request No.<br>(*Thull* Dkt. 3-3, at 4-7.) | Corresponding *Santillan* Request No.<br>(*Santillan* Dkt. 4-2, at 30-31.) | Short Description of Document Request[2] |
|---|---|---|
| **Disputed Requests** | | |
| *Thull* Request No. 1 | *Santillan* Request No. 6 | Requesting the documents the Court ordered produced by SawStop to Grizzly in *Grizzly v. Santella*, Civ. No. 3:12-mc-00131-SI. |

---

[2] This summary description is not intended to replace or supplement, by limiting or expanding, the scope of the requests in the subpoenas. The specific language used in the subpoenas, *Thull* Dkt. 3-3; *Santillan* Dkt. 4-2, at 27-32, controls.

| | | |
|---|---|---|
| *Thull* Request No. 5 | No Corresponding *Santillan* Request | Requesting documents referencing false activations of AIMT incorporated into SawStop's commercially available saws. |
| *Thull* Request Nos. 6-7 | No Corresponding *Santillan* Requests | Requesting documents showing SawStop's annual sales figures and future predictions for saws and brake cartridges. |
| *Thull* Request No. 8 | No Corresponding *Santillan* Request | Requesting documents evincing complaints or dissatisfaction with SawStop's AIMT equipped saws. |
| *Thull* Request Nos. 9-14 | *Santillan* Request Nos. 7-12 | Requesting documents evincing SawStop's attempts to design, test, and commercialize a benchtop saw incorporating AIMT from 2010 through 2013, including "any future years." The information sought includes costs, a bill of materials, design drawings, and consultative communications. |
| *Thull* Request Nos. 15-20 | No Corresponding *Santillan* Requests | Requesting documents evincing SawStop's attempts to design, test, and commercialize a contractor saw incorporating AIMT, which would be available in the "near future." The information sought includes costs, a bill of materials, design drawings, and consultative communications. |
| *Thull* Request Nos. 21, 23-24 | No Corresponding *Santillan* Requests | Requesting documents demonstrating SawStop's business plans and financial models: exchanged with investors; used in soliciting investors; and demonstrating the specific ownership interests in SD3, LLC and SawStop, LLC. |
| *Thull* Request No. 28 | No Corresponding *Santillan* | Requesting correspondence |

| | Request | with electrical engineers involved in bringing SawStop's first commercial saw to market. |
|---|---|---|
| *Thull* Request No. 30 | *Santillan* Request No. 15 | Requesting documents evincing SawStop's meetings and contracts with Taiwanese manufacturers. |
| **Partially Disputed** | | |
| *Thull* Request No. 26 | No Corresponding *Santillan* Request | Requesting SawStop's U.S. patent applications filed since 2010 and U.S. patents issued since 2000. The parties dispute whether confidential pending patent applications need to be produced. |

The remaining requests, *Thull* Request Nos. 2-3, 4, 22, 25, 27, 29, and 31-35[3] and

*Santillan* Request Nos. 1-5, 13-14, 16-18 are not at issue because no responsive documents exist

or the parties resolved that particular dispute. *See, e.g.*, SawStop's *Thull* Resp. at 16 n.2, 18 n.3,

20-21; *Thull* Dkt. 3-13 (SawStop's objections to the *Thull* subpoena); *Santillan* Dkt. 4-2, at 36-

45 (SawStop's objections to the *Santillan* subpoena).

SawStop's objections to the disputed requests fall into three broad categories. First,

SawStop objects to the scope of some requests. Second, SawStop argues that the disclosure of its

confidential information, which is implicated in numerous requests, would lead to competitive

harm. Third, SawStop argues that responding to all of the requests would be financially

burdensome. The Court addresses each in turn.

---

[3] The parties' only disagreement with respect to *Thull* Requests 4 and 25 is who should bear the cost of producing a privilege log. The Court addresses SawStop's request for cost-shifting in § 3 below.

### A.      Relevance

Federal Rule of Civil Procedure 45 governs the issuance of subpoenas, which may be directed to non-parties. Fed. R. Civ. P. 45. Non-party witnesses are subject to the same broad scope of discovery that governs parties to litigation. *See, e.g.*, Fed. R. Civ. P. 45, Advisory Notes to 1991 Amendment ("The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34."). Under Federal Rule of Civil Procedure 34, which governs document requests, a party may seek discovery within the limits imposed by Federal Rule of Civil Procedure 26(b). *See* Fed. R. Civ. P. 34(a). Accordingly, non-party discovery includes "any nonprivileged matter that is relevant to any party's claim or defense," and the scope of discovery may include, "[f]or good cause . . . any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). Relevance to the subject matter "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

### 1.      Relevant to a Claim or Defense

In the underlying litigations, Plaintiffs allege that Defendants manufactured or sold Plaintiffs saws that were unreasonably dangerous because, *inter alia*, the saws did not incorporate AIMT. *Thull* Dkt. 3-1, at ¶¶ 23-41; *Santillan* Dkt. 4-1, at pp. 8-10 ¶¶ 27-41. In a products liability claim alleging defective design, a product is unreasonably dangerous when the manufacturer's adoption of a "reasonable alternative design" could have reduced or negated the plaintiff's actual harm. *See, e.g.*, RESTATEMENT (THIRD) OF TORTS, Prod. Liab. § 2(b) (1998); *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 387 (Minn. Ct. App. 2004) ("Since its publication, we have relied on RESTATEMENT (THIRD) OF TORTS when considering the law of

products liability.").[4] The reasonableness of an alternative design is informed by many factors,

including technical feasibility, costs, aesthetics, and consumer expectations. *See* RESTATEMENT

(THIRD) OF TORTS, Prod. Liab. § 2, Comment f; 4A MINN. PRAC. JURY INSTR., CIVJIG 75.20

(5th ed.) (identifying technological feasibility, safety, cost, and performance as relevant factors

for a jury to consider when deciding the feasibility of an alternative design).

SawStop argues that Defendants' document requests are not relevant because Dr. Gass

developed AIMT well before Defendants manufactured the allegedly defective table saws.

Plaintiff Thull alleges that he was injured by a saw manufactured in late 2007 (*Thull* Dkt. 3-1,

at ¶ 11); Plaintiff Santillan-Padilla alleges that he was injured by a saw manufactured in late

2005 (*Santillan* Dkt. 4-1, at p. 6 ¶ 12). According to Dr. Gass' expert report, filed in both  cases,

it took him approximately one month to build a "working, proof-of-concept prototype" out of

common electronic components. *Thull* Dkt. 3-2, at ¶ 12.[5] Dr. Gass filed the initial patent

covering AIMT in 1999, and the manufacturers shipped SawStop the first commercial AIMT-

equipped saws in summer 2004. *Thull* Dkt. 3-2, at ¶¶ 8, 56. As of February 5, 2013, SawStop

sells three AIMT-equipped saws: (1) an industrial cabinet saw; (2) a professional cabinet saw;

and (3) a contractor saw. *Thull* Dkt. 3-2, at ¶ 57; *Santillan* Dkt. 4-1, at p. 45-46 ¶ 57. Dr. Gass

---

[4] The parties make limited references to Minnesota's law of products liability. *See Thull* Dkt. 3, at 16; *Thull* Dkt. 8, at 8-9. The parties do not cite any decisions from California, where the *Santillan* case is pending. Accordingly, the Court presumes that there are no material differences between the laws underlying the two cases and references the laws of Minnesota. *But see Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 95 (Minn. 1987) (noting that the courts of California and Oregon treat a particular products liability issue, not relevant to the underlying cases in this action, differently and agreeing with Oregon's approach).

[5] Except where indicated, there are no material differences between Dr. Gass' August 15, 2012 expert report, filed in *Thull*, and Dr. Gass' February 5, 2013 expert report, filed in *Santillan*. *Compare Thull* Dkt. 3-2, *with Santillan* Dkt. 4-1, at p. 23-Dkt. 4-2, at p. 18. Accordingly, the Court will not cite to the *Santillan* expert report unless necessary.

opines that "it is well within [Defendants'] ability to implement [AIMT]," which would have prevented Plaintiffs' injuries, through the same processes Defendants use to design new saws. *Thull* Dkt. 3-2, at ¶¶ 67, 69.

SawStop also argues that because it offered a commercial saw incorporating AIMT by 2004, approximately a year before Defendants manufactured the *Santillan* saw, it is undisputed that AIMT was technologically feasible, rendering Defendants' related requests irrelevant. Although AIMT was independently feasible in 2004, SawStop first implemented the technology in a cabinet saw. *See id.* at ¶ 56. In their complaints, Thull and Santillan merely allege that they were injured by table saws, *Thull* Dkt. 3-1, at ¶ 11; *Santillan* Dkt. 4-1, at p. 6 ¶ 12, which include "three generally-recognized categories": "benchtop saws, contractor saws, and cabinet saws." *See Osorio v. One World Technologies Inc.*, 659 F.3d 81, 83 n.2 (1st Cir. 2011). Although the parties are not explicit, the allegedly defective table saws are likely more accurately described as contractor saws. *See* Dkt. 17, at 15.[6]

Defendants respond to SawStop's argument by pointing to the differences between cabinet saws, like the saw introduced in 2004, and the contractor saws at issue. In a deposition, Dr. Gass testified that SawStop's AIMT-equipped contractor saw weighs around 285 pounds. *Thull* Dkt. 17-4, at 4; *see also Thull* Dkt. 3-2, at ¶ 57 (describing cabinet saws as "heavy-duty" with larger motors and contractor saws as "smaller"). SawStop did not begin commercially offering its contractor saws until 2008. *Thull* Dkt. 17-4, at 3-4. Accordingly, the technical feasibility of Plaintiffs' proposed alternative design for contractor saws, one incorporating

---

[6] Further, Plaintiffs included the makes and models of the table saws in their respective complaints. *Thull* Dkt. 3-1, at ¶ 11 (RIDGID Model TS3660); *Santillan* Dkt. 4-1, at p. 6 ¶ 12 (Craftsman Model No. 315.218290). A cursory internet search for the saws confirms the contractor saw appellation.

AIMT, during the relevant periods is not conclusively established. If, as Dr. Gass' expert report suggests, Plaintiffs claim the injuring contractor saws were unreasonably dangerous because Defendants should have incorporated AIMT, then SawStop's handling of the same issue is relevant to a claim or defense. Accordingly, *Thull* Requests 16-20 are within the scope of discovery to the extent they do not extend beyond SawStop's introduction of the AIMT-equipped contractor saw.[7]

In *Thull* Requests 5 and 8, Defendants seek access to documents that reflect customer complaints or technical problems with AIMT. In *Thull* Requests 6-7, Defendants seek documents showing SawStop's annual sales of table saws and replacement brake cartridges, including future forecasts, which Defendants argue demonstrates consumers' willingness to purchase saws equipped with AIMT. This information is within the broad range of factors that a fact-finder may consider in determining whether AIMT is a reasonable alternative design. *See* RESTATEMENT (THIRD) OF TORTS, Prod. Liab. § 2, Comment f (listing relevant factors as including "product longevity, maintenance, [and] repair" and consumer choice). Moreover, although the type of table saw—cabinet, contractor, or benchtop—may influence the feasibility of implementing the technology, SawStop has not demonstrated that the consumer's experience with AIMT varies over that range. Accordingly, *Thull* Requests 5-8 are relevant to a claim or defense.

SawStop objects to several of the requests by arguing that the documents sought are irrelevant because the technical feasibility of AIMT is established as a matter of law by SawStop's 2004 release of an AIMT-equipped saw. SawStop argues that Minnesota law is clear: "evidence of the existence of a safer alternative design on the market establishes the existence of

---

[7] *Thull* Request 15 also seeks documents related to SawStop's efforts to commercialize AIMT-equipped contractor saws, but the request is temporally overbroad in focusing on products coming to the market "in the near future." *Thull* Dkt. 3-3, at ¶ 15.

a safer alternative design." *Thull* Dkt. 8, at 17 (citing *Rousu v. Rubbermaid Commercial Products, LLC*, CIV. 09-1987 MJD/LIB, 2011 WL 884125, at *4 (D. Minn. Mar. 14, 2011)). Accordingly, SawStop argues, documents related to the development, marketing, and commercialization of AIMT, spanning 1999 through 2004, are irrelevant because SawStop released a saw incorporating AIMT in 2004. *Id.* at 18. The cases cited by SawStop do not, however, illuminate the issue before the Court because the cases discuss the reliability, as a proxy for admissibility, of expert testimony in design-defect cases. *See, e.g.*, *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1012 (8th Cir. 2005) (rejecting an expert's testimony because the expert did not demonstrate how the alternative design "would be integrated into the [injuring device] or . . . [the design's] use with similar machines"); *McRunnel v. Batco Mfg.*, 917 F. Supp. 2d 946, 953 (D. Minn. 2013) (declining to exclude an expert for failing to test an alternative design because, *inter alia*, the design was used on similar devices in the market).The Court's search of Minnesota case law did not reveal case law standing for the proposition that SawStop asserts.

In *Rousu*, for example, the court concluded that the alternative design testimony presented by the plaintiff's expert was sufficiently reliable despite the expert's failure to test the proposed design. *See Rousu v. Rubbermaid Commercial Prods. LLC*, Civil No. 09-1987 (MJD/LIB), 2011 WL 884125, at *4 (D. Minn. Mar. 14, 2011). The court held that testing was not necessary where "the expert's proposed alternative design is in service in the market." *Id.* Far from finding technical feasibility established as a matter of law, the court held that the expert's testimony merely created a dispute of material fact "whether the [product] was defectively designed," precluding summary judgment. *Id.* at *6. The other cases cited by SawStop similarly limit their discussion to the reliability of an expert's testimony when that expert's proposed

alternative design is untested. *See, e.g.*, *Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 790-91 (8th Cir. 2005) (holding that evidence of the alternative design's actual installation rendered the expert's testimony sufficiently reliable "to survive summary judgment"); *Keller v. CNH Am., LLC*, CIV. 071648ADMAJB, 2009 WL 1766695, at *5 (D. Minn. June 22, 2009) (holding that despite the expert's failure to test the proposed alternative design, the expert's opinion satisfies *Daubert*). Indeed, technological feasibility turns, in part, on the similarity between the injuring device and the commercially available device that incorporates the alternative design, which "can be addressed on cross examination." *See McRunnel*, 917 F. Supp. 2d at 953; *see also Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997) (affirming the rejection of an expert's alternative design because of design "differences that prevent the automatic assumption that what works on one with will work on another").

Even if technological feasibility were not at issue in the underlying lawsuits, the alternative design's overall feasibility depends on a number of factors, which are informed by many of Defendants' document requests. *See* Restatement (Third) of Torts, Prod. Liab. § 2, Comment f; 4A Minn. Prac. Jury Instr., CIVJIG 75.20 (5th ed.); *accord Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 621 (Minn. 1984) (adopting an objective balancing test in design-defect cases). Accordingly, *Thull* Requests 28 and 30 and *Santillan* Request 15, which seek documents evincing the development and commercialization of AIMT, are relevant to a claim or defense.[8]

Finally, in *Thull* Request 1 and *Santillan* Request 6, Defendants seek all of the documents that SawStop produced to Defendant Grizzly in *Santella v. Grizzly Industrial, Inc.*, 3:12-mc-00131-SI, pursuant to this Court's Order in that case. SawStop argues that Defendants have not

---

[8] This reasoning also applies to *Thull* Requests 16-20, as discussed and limited above. *See supra* n. 7 and corresponding text.

identified the documents requested with sufficient specificity. SawStop also argues that factual differences, particularly the manufacturing date of the injuring saw, render the *Santella* documents irrelevant.

Although the Court agrees that this request is framed broadly, in this particular circumstance, substantial efficiencies are realized through such a framing. As the parties discussed, upon modification of this Court's protective order entered in *Santella*, Defendants can obtain a complete set of the *Santella* documents from Grizzly's counsel, which removes any burden from SawStop. In addition, for precisely the same reasons that the *Santella* documents were relevant in that case, they are also relevant in the underlying *Thull* and *Santillan* lawsuits. *See Santella v. Grizzly Industrial, Inc.*, Civ. No. 3:12-mc-00131-SI (D. Or.), Dkt. 40. Accordingly, *Thull* Request 1 and *Santillan* Request 6 are relevant to a claim or defense.

### 2.    Impeachment Evidence

In addition to evidence going to the merits of a case, evidence may be introduced to impeach a witness. *See* Fed. R. Evid. 607. The scope of discovery thus may include "information for other purposes such as cross-examination of adverse witnesses." *Kerr v. U.S. Dist. Court for N. Dist. of California*, 511 F.2d 192, 196-97 (9th Cir. 1975) *aff'd*, 426 U.S. 394 (1976). A court, however, must first make a finding of good cause before allowing the discovery of evidence the only relevance of which is that it may be useful for impeachment of a witness. *See Thornton v. Crazy Horse, Inc.*, 3:06-CV-00251TMB, 2010 WL 3718945, at *1 (D. Alaska Sept. 14, 2010) (concluding "good cause" is required to discover impeachment evidence that is not relevant to the parties' claims and defenses); *Ferguson v. N. Broward Hosp. Dist.*, 10-61606-CIV, 2011 WL 1883974, at *4-5 (S.D. Fla. May 17, 2011) (compiling cases and noting that courts are worried about the "virtually limitless" bounds of impeachment evidence). In the pending cases,

the Court finds that Defendants have demonstrated good cause to seek evidence that they may

use to impeach Dr. Gass. Rather than attempting to test the "virtually limitless" bounds of

relevant impeachment evidence, *see* 1 McCormick On Evid. § 39 (7th ed.) (compiling an

exhaustive list of potential categories of impeaching evidence), Defendants have narrowed their

requests to two areas: (1) Dr. Gass' alleged financial bias, *see e.g.*, *United States v. Abel*, 469

U.S. 45, 49-50 (1984) (permitting impeachment through "bias"), and (2) Dr. Gass' prior

contradictory testimony. Moreover, Dr. Gass' unique position in the underlying litigation—as

both Plaintiffs' volunteer expert witness and the inventor of Plaintiffs' competing and proffered

"reasonable alternative design"—makes Defendants' focused inquiries both relevant and proper.

*Cf. Rogers v. U.S. Navy*, 223 F.R.D. 533, 536 (S.D. Cal. 2004) (restricting the plaintiff's access

to evidence of an expert's gross annual income when the plaintiff has sufficient other evidence

by which to show financial motive and bias). Accordingly, *Thull* Requests 9-14, 21, and 23-24

are permissible discovery requests.

### B.    Limitations on Scope

Even for evidence otherwise discoverable, the scope of discovery is curtailed by specific

provisions in Rule 45 and general considerations found in Rule 26. A court must quash or

modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P 45(c)(3)(A). A court

may quash or modify a subpoena that seeks confidential information; however, upon a showing

of "substantial need," a court may order production of the confidential information subject to

protective measures. Fed. R. Civ. P. 45(c)(3)(B), (C). Further, a court must limit discovery that is

"unreasonably cumulative," that can be more conveniently obtained from another source, or

where the burden of discovery outweighs the benefits. *See* Fed. R. Civ. P. 26(b)(2)(C).

Having concluded that Defendants' document requests, except where noted, are within the scope of Federal Rule of Civil Procedure 26(b)(1), the Court turns to SawStop's objection that many of Defendants' requests require SawStop to disclose confidential information. A court may quash a subpoena that requires the disclosure of confidential information. Fed. R. Civ. P. 45(c)(3)(B)(i). Upon a subpoenaing party's showing of substantial need and undue hardship, a court may specify conditions for the disclosure of confidential information, which include reasonable compensation for the subpoenaed party. *See* Fed. R. Civ. P. 45(c)(3)(C).[9]

SawStop objects to a number of Defendants' requests by claiming that the responsive documents contain confidential technical and financial information. There is not, however, an absolute privilege for confidential information. *See generally Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979) ("The courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure. Frequently, they have been afforded a limited protection.") (quotation marks and citations omitted). Moreover, all parties have agreed to enter into a comprehensive, two-tiered protective order similar to the protective order entered by the Court in *Santella. See, e.g.*, *Thull* Dkt. 8, at 21 (requesting entry of a "strict" protective order).

For the reasons discussed above— namely SawStop's complete control of all the information regarding AIMT as an alternative design—Defendants have made a sufficient showing of "substantial need." SawStop also argues with respect to several requests that Defendants seek this information solely to obtain a competitive advantage. *See, e.g.*, Dkt. 8, at 18 (arguing Defendants will use SawStop's confidential financial information to "unfairly approach investors"). The Court is ordering that any compelled production of competitively sensitive

---

[9] The Court addresses cost shifting in Section III of this Opinion and Order.

information be subject to a two-tiered protective order that strictly limits the use and dissemination of SawStop's confidential information. The Court is cognizant of the parties' relationship as competitors in the power tool industry. In the context of the underlying litigation, however, Defendants are entitled to obtain information, confidential or otherwise, that is reasonably necessary to the presentation of their defense, especially in this context where SawStop's principal, Dr. Gass, has voluntarily injected himself (and his companies) into these disputes by serving as an unpaid expert witness for Plaintiffs in the underlying lawsuits.

In several instances, however, the Court agrees with SawStop that Defendants' requests are overly broad, seeking confidential information that, while perhaps marginally relevant, does not sufficiently implicate Defendants' litigation needs in the underlying lawsuits. *See* Fed. R. Civ. P. 26(b)(1). In *Thull* Requests 9-14 and *Santillan* Requests 7-12, Defendants seek all documents related to SawStop's past *and future* development and commercialization of an AIMT-equipped *benchtop* saw. *See Thull* Dkt. 3-3, at ¶¶ 9-14; *Santillan* Dkt. 4-2, at 22. As SawStop argues, benchtop saws are not at issue in the underlying litigation. Defendants, however, argue that the evidence is necessary to impeach Dr. Gass for statements he made regarding SawStop's delay in introducing an AIMT-equipped benchtop saw. *See, e.g.*, *Thull* Dkt 17-3, at 3 (testifying in 2012 that SawStop "hopes to have [a 70 pound benchtop saw] out around the end of the year" ). Defendants seek a substantial amount of confidential information, which concerns an as-of-yet-unreleased product, simply to try to impeach Dr. Gass with a prior inconsistent statement.[10] Accordingly, the Court strikes *Thull* Requests 9-14 and *Santillan*

---

[10] Defendants also argue that the documents will "demonstrate the real reason it has taken nearly 15 years to bring [an AIMT-equipped] benchtop saw . . . to the market." *Thull* Dkt. 17, at 14-15. Defendants do not, however, explain why this is relevant to the underlying litigation, which involves contractor saws.

Requests 7-12 because SawStop's interest in keeping this information confidential outweighs Defendants' proffered use.

In *Thull* Request 26, the parties dispute whether SawStop should be required to turn over confidential pending patent applications. Defendants argue that it needs the pending applications to demonstrate SawStop's "extensive patent web," which allegedly contradicts Dr. Gass' proffered "altruistic" motive for testifying. *Thull* Dkt. 17, at 17. Defendants' limited use does not overcome the confidential nature of SawStop's pending patent applications. Moreover, Defendants already have a substantial amount of information by which to establish Dr. Gass' alleged bias, including issued patents and public patent applications and SawStop's financial information. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (requiring courts to limited "unreasonably duplicative or cumulative" discovery). Accordingly, the Court modifies *Thull* Request 26 to exclude SawStop's confidential pending patent applications.

In *Thull* Request 5, Defendants seek documents describing false activations of AIMT. Although false activations are generally relevant to Defendants' defenses, any information that specifically identifies SawStop's customers need not be produced and may be redacted. In *Thull* Request 24, Defendants seek documents revealing the ownership interests of SawStop, LLC and SD3, LLC; pursuant to Defendants' stipulation, SawStop may omit any identifying information for each individual investor. *See Thull* Dkt. 17, at 16.

## II.    Mr. Domeny's Access to Confidential Information

In *Santella*, the defendant sought to ensure its chosen expert witness for trial, Mr. Peter Domeny, has access to SawStop's Confidential and Attorneys' Eyes Only (collectively, "confidential") information, which was covered by a two-tiered protective order (*Santella* Dkt. 16). Although the parties in this case did not directly address Mr. Domeny's access to SawStop's

confidential information in their merits briefing, the parties' arguments demonstrate that this issue is currently in dispute among the parties. *See, e.g.*, *Thull* Dkt. 22 (incorporating SawStop's briefing regarding the propriety of Mr. Domeny's access from the *Santella* matter). Accordingly, as the parties have done, the Court incorporates by reference its Findings of Fact and Conclusions of Law (*Santella* Dkt. 50) from the *Santella* matter. *See also Santella v. Grizzly Indus., Inc.*, 3:12-MC-00131-SI, 2012 WL 5399970 (D. Or. Nov. 5, 2012).

In *Santella*, the defendant sought to use Mr. Domeny as an independent consultant and testifying expert in the underlying litigation; SawStop objected to Mr. Domeny's access to its confidential information. Because of Mr. Domeny's previous affiliation and disputed continuing involvement with SawStop's competitors in the power tool industry, SawStop argued that Mr. Domeny's acquisition of SawStop's confidential information would cause it substantial competitive harm. In response, the defendant argued that Mr. Domeny has agreed to abide by the existing protective order and that the defendant's ability fairly to present its case would be severely impaired if Mr. Domeny could not review SawStop's confidential information. On September 24, 2012, the Court held an evidentiary hearing in *Santella* to determine whether Mr. Domeny should be allowed access to SawStop's confidential information. *Santella* Dkt. 39.

The Court in *Santella* found Mr. Domeny to be credible and able and willing to abide by the Court's protective order, but the Court also considered Mr. Domeny's current involvement with the power tool industry after his retirement, including his continuing lobbying efforts. Following *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir.1992), the Court balanced the risk of Mr. Domeny's inadvertent disclosure of SawStop's confidential information against the risk of impairing the defendant's ability to defend itself in the underlying litigation. In particular, the Court focused its analysis on whether Mr. Domeny was or would be involved in

competitive decision-making, which would imply a strong risk of Mr. Domeny's inadvertent disclosure to SawStop's competitors.

On balance, the Court concluded that "there is no reasonable likelihood that Mr. Domeny would inadvertently disclose SawStop's confidential information." *Santella*, 2012 WL 5399970, at *7. Further, the Court concluded that "denying Mr. Domeny access to SawStop's confidential information will unreasonably limit and impair [the defendant's] ability to defend itself at trial. *Id.* at *8. Accordingly, notwithstanding SawStop's objections, the Court granted the defendant's motion to compel, allowing Mr. Domeny access to the confidential information SawStop previously produced to the defendant subject to the restrictions imposed by the protective order.

In the dispute now before the Court, the parties have expressly referenced and incorporated the Court's *Santella* decision and the underlying briefing and evidence from that case. In the interests of judicial efficiency and economy, the Court hereby adopts and incorporates by reference its Findings of Fact and Conclusions of Law from the *Santella* matter. *Santella* Dkt. 50. The Court notes, however, that this ruling *only* applies to the documents that SawStop produced to Grizzly in the *Santella* matter that are coextensive with *Thull* Request 1 and *Santillan* Request 6. The Court has not made any findings with respect to the other documents requested by Defendants. In particular, the Court is concerned that the risk of inadvertent disclosure is substantially higher where the confidential information includes current research and business information. Just as SawStop has not proffered any reason for the Court to reconsider its opinion in *Santella*, Defendants have not proffered any reason why the opinion should be expanded.

### III.    Costs of Production

Finally, SawStop argues that the Court should shift to Defendants SawStop's costs to comply with Defendants' subpoenas. Defendants correctly respond that SawStop is not truly a disinterested party, which is sufficient to defeat SawStop's efforts to shift the financial burden of compliance. Additionally, Defendants argue that it was SawStop's actions, not Defendants' actions, that have caused the burdens complained about in this matter.

Federal Rule of Civil Procedure 45 provides several methods that a court may use to defray a party's costs in complying with a subpoena. If the serving party does not "take reasonable steps to avoid imposing an undue burden or expense" on a subpoena recipient, a court must "impose an appropriate sanction." Fed. R. Civ. P. 45(c)(1). In addition, if a recipient timely objects to a subpoena and the serving party seeks a motion to compel, a court "must protect a [third-party] . . . from significant expense resulting from compliance." Fed. R. Civ. P. 45(c)(2)(B).

### A.    Rule 45(c)(1) Sanctions

Pursuant to Federal Rule of Civil Procedure 45, discovery sanctions are appropriate when the serving party fails to "take reasonable steps to avoid imposing an undue burden or expense," Fed. R. Civ. P. 45(c)(1). The "undue burden" provision was intended to incorporate the general discovery obligations found in Federal Rule of Civil Procedure 26(g). *See* Fed. R. Civ. P. 45, Advisory Notes to 1991 Amendment. Under Rule 26(g), parties must, among other things, refrain from advancing frivolous legal arguments, engaging in discovery with an improper purpose, or seeking discovery that is unduly burdensome. "[S]anctions[, however,] should not result from normal advocacy," which may include presenting novel or creative legal arguments. *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 426 (9th Cir. 2012).  In assessing "undue

burden" and the other Rule 26(g) obligations, a court must only look at the "harms inflicted by complying with the subpoena" and not "related follow-on issues." *Id.* at 428. Further, the "undue burden" standard does not change simply because discovery is sought from a third-party. *See id.* at 429.

Despite SawStop's objections, the Court largely upholds a substantial portion of Defendants' subpoenas. Further, where the Court declines to compel discovery, Defendants' supporting arguments were not frivolous, and the Court has seen no evidence that Defendants acted in bad faith. As the Court recognizes, the factors relevant to determining if a proposed alternative design is reasonable are numerous. *See, e.g.*, RESTATEMENT (THIRD) OF TORTS, Prod. Liab. § 2, Comment f; *cf.* 8 WRIGHT AND MILLER'S FED. PRAC. & PROC. CIV. § 2011 (3d ed.) ("[A] party is entitled to seek discovery on its theory of the facts and the law, and is not limited in discovery by the opponent's theory.").  The Court finds that Defendants took reasonable steps to avoid imposing on SawStop undue burden or expense. Sanctions, therefore, are not warranted.

## B.    Rule 45 Cost-Shifting

Pursuant to Federal Rules of Civil Procedure 45(c)(2)(B) and 45(c)(3)(C), in certain circumstances a court may shift the costs of complying with a subpoena. These provisions reflect the general rule that non-parties "should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party." *United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371 (9th Cir. 1982). Although the issues of discovery sanctions and shifting discovery costs are discrete, SawStop appears to conflate the two and Defendants only argue that sanctions are inappropriate. Further, cost-shifting pursuant to Federal Rule of Civil Procedure 45(c)(2)(B)(ii) is intended to shield a non-party from "significant expense resulting from compliance." Although SawStop's arguments touch on this, focusing primarily on the

scope of Defendants' requests and SawStop's non-party status, the Court is being asked to speculate as to what SawStop's actual costs of compliance may be and whether they will be significant. At this time, the Court defers ruling on any request for cost-shifting, including who should pay for the production of privilege logs. *See Columbia Broad.*, 666 F.2d at 368-69 (recognizing that a district court has broad discretion in "creatively" resolving reimbursement of costs motions and those motions may be brought post-compliance).

## CONCLUSION

Defendants' Motions to Compel (*Thull* Dkt. 1; *Santillan* Dkt. 1) are GRANTED in part AND DENIED in part as follows: SawStop's objections to *Thull* Requests 1, 6-8, 21, 23, 28, and 30 and *Santillan* Requests 6 and 15 are OVERRULED; SawStop's objections to *Thull* Requests 5, 16-20, 24, and 26 are OVERRULED in part and SUSTAINED in part, and the requests are modified as described in this Opinion and Order; and SawStop's objections to *Thull* Requests 9-15 and *Santillan* Requests 7-12 are SUSTAINED. In addition, SawStop's Motion for Discovery Sanctions (*Thull* Dkt. 8, at 21-23) is DENIED, and SawStop's Motion for Costs of Compliance (*Thull* Dkt. 8, at 21-23) is DENIED without prejudice. Not later than August 30, 2013, the parties shall confer and submit either a joint proposed protective order or separate briefing, not to exceed five pages, explaining why the protective order previously entered in *Santella* needs to be substantively modified.

IT IS SO ORDERED.

DATED this 12th day of August, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

Page 23 – OPINION AND ORDER